[Cite as *State v. Oliver*, 2023-Ohio-1550.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

     Plaintiff-Appellee,                     :               No. 21AP-449
                                                                                         (C.P.C. No. 19CR-5430)

v.                                                         :

                                                                                        (REGULAR CALENDAR)
Ja'Braelin D. Oliver,                           :

     Defendant-Appellant.                 :

D E C I S I O N

Rendered on May 9, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Taylor M. Mick,* for appellee. **Argued:** *Taylor M. Mick*.

**On brief:** *Yeura R. Venters*, Public Defender, and *Leon J. Sinoff,* for appellant. **Argued:** *Leon J. Sinoff*.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} After a police officer pulled over the vehicle being driven by defendant-appellant, Ja'Braelin D. Oliver—and in which four other people were riding—he smelled raw marijuana coming from the car. Without making any inquiry into the source of that odor or determining whether it could be attributed to any particular person in the vehicle, the officer removed Mr. Oliver from the car, placed him in handcuffs, and searched his person. The officer found a firearm in the pocket of Mr. Oliver's jacket. After the trial court denied Mr. Oliver's suppression motion, Mr. Oliver pled no contest to the two fourth-degree felony gun charges in his accompanying felony case.

{¶ 2} On appeal, Mr. Oliver maintains the firearm should have been suppressed as evidence because it was the fruit of an unlawful traffic stop and search of his person under

the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sections 14 and 16 of the Ohio Constitution.  We do not agree the stop was unlawful.  We find the warrantless search of his person, however, was.  Accordingly, we reverse the Franklin County Court of Common Pleas judgment denying Mr. Oliver's suppression motion, vacate Mr. Oliver's felony convictions and sentence—which were based solely on the evidence found on his person during the unconstitutional search—and remand this case to the trial court for proceedings consistent with this decision.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3}  On October 21, 2019, Mr. Oliver was indicted by a Franklin County Grand Jury with improper handling of a firearm in a motor vehicle, a violation of R.C. 2923.16(B), and carrying a concealed weapon, a violation of R.C. 2923.12(A)(2), both felonies of the fourth degree. These charges were based on evidence (a loaded firearm) recovered on August 18, 2019 from a pat-down search of Mr. Oliver conducted during a traffic stop.

{¶ 4}  Mr. Oliver moved to suppress the firearm, arguing it was obtained in violation of the Fourth Amendment to the United States Constitution; Article I, Section 14 of the Ohio Constitution; and Crim.R. 41.  (May 13, 2021 Mot.)  In his motion, Mr. Oliver argued that Whitehall Police Officer Runyan did not have probable cause to conduct a traffic stop and contended his prolonged detention and the pat-down search of his person were not justified under *Terry v. Ohio*, 392 U.S. 1 (1968).[1]

{¶ 5}  In its written response, plaintiff-appellee, the State of Ohio, argued the traffic stop was supported by probable cause and/or reasonable suspicion.  (May 25, 2021 Memo. Contra at 2-3.) It premised the lawfulness of Mr. Oliver's prolonged detention, the pat-down search of Mr. Oliver's person, and the vehicle search on the "plain smell" doctrine. The state argued that because Officer Runyan detected the odor of raw marijuana emanating from the stopped Hyundai being driven by Mr. Oliver, the officer was permitted to prolong the stop and had probable cause to search all five occupants (including Mr. Oliver) and the car.  The state did not argue the search of Mr. Oliver's person was justified

---

[1] In his written motion, Mr. Oliver also challenged the lawfulness of the vehicle search, which occurred after Officer Runyan frisked Mr. Oliver's person and found the gun in his jacket pocket.  (May 13, 2021 Mot. at 7-9.)  Mr. Oliver abandoned his arguments relating to the vehicle search in the trial court, however, and did not attempt to resuscitate them on appeal.

as a protective *Terry* frisk for weapons. (*Compare* May 25, 2021 Memo. Contra *with* May 13, 2021 Mot. at 9-11.)

{¶ 6} In his supplemental motion, Mr. Oliver challenged the validity of the state's "plain smell" arguments under the facts of this case and recent changes to Ohio law. (*See* July 2, 2021 Suppl. Mot.) Specifically, Mr. Oliver contended the odor of marijuana alone can no longer be inherent evidence of criminal activity since the Ohio legislature legalized hemp—which also comes from the cannabis plant—a few weeks prior to the stop. This is because, Mr. Oliver argued, the odor of illegal marijuana cannot be distinguished from the odor of legal hemp. He also reiterated the arguments from his first motion that the pat-down search of his person was not justified under *Terry* because Officer Runyan did not develop any particularized basis to believe Mr. Oliver was armed and presently dangerous before he conducted the warrantless search. The state filed no further written responses.

{¶ 7} At the July 8, 2021 suppression hearing, the state presented testimony from Officer Runyan about the traffic stop, prolonged detention, and search of Mr. Oliver's person. The prosecutor played a recording from Officer Runyan's cruiser camera, which depicted Mr. Oliver's driving prior to the traffic stop. (Hearing Ex. B; Hearing Ex. B-1.) He also presented as exhibits a printout of the marked lanes statute, R.C. 4511.33, and a copy of the traffic ticket showing Officer Runyan cited Mr. Oliver for violating R.C. 4510.12(A)(1) (driving without a valid license) and R.C. 4511.33(A) ("weaving"). (Hearing Ex. C; Hearing Ex. D.)

{¶ 8} During her cross-examination of Officer Runyan, Mr. Oliver's counsel played more footage from Officer Runyan's cruiser camera (Hearing Ex. 1) and a recording from Officer Runyan's body camera. (Hearing Ex. 4.) The body camera footage depicted Officer Runyan's interaction with Mr. Oliver and the four passengers and showed his pat-down search of Mr. Oliver's person. (*See* Hearing Ex. 4.) The defense also produced Officer Runyan's written report relating to this incident and questioned him about its contents. (*See* Hearing Ex. 3.)

## A. Evidence and Testimony Presented at the Suppression Hearing

{¶ 9} At the suppression hearing, Officer Runyan testified that he was driving his cruiser in the inner eastbound lane of East Main Street shortly after midnight on August 18,

2019, when he came upon a blue Hyundai Sonata traveling in the outer (curb) eastbound lane of the road.  (Tr. at 15.)  There were five people in the Hyundai, including Mr. Oliver, who was driving. (Tr. at 16.) Officer Runyan drove his cruiser parallel to the Hyundai, slowed down, and then pulled behind the Hyundai in the outer eastbound lane.  (Tr. at 28-29. *See* Hearing Ex. B, 1.)

{¶ 10}  After several seconds, Officer Runyan observed the Hyundai's left tires drive on the lane divider (broken white) line for about one second.  (Tr. at 15-16, 29, 35.)  Instead of conducting a traffic stop of the Hyundai for what he believed was a marked lanes violation, Officer Runyan continued to follow behind the Hyundai. (Tr. at 27-29, 33.) Officer Runyan testified he did this because he thought the driver "may be impaired."  (Tr. at 15, 28-29, 35. *See also* Hearing Ex. 3 at ¶ 1.)  Officer Runyan watched the Hyundai drive within its lane "for a long period of time."  (Tr. at 29.)  Then, he saw the Hyundai's left turn signal illuminate before the vehicle properly crossed the lane divider line to move into the inner eastbound lane.  (Tr. at 30-32.)

{¶ 11}  The inner eastbound lane of the roadway was, at relevant times, separated from the inner westbound lane of East Main Street by a two-way left-turn center lane.  (*See generally* Hearing Ex. 1.) The edges of a two-way left-turn center lane are delineated by a broken yellow line and a solid yellow line on each side of the lane.  *See* Manual of Uniform Traffic Control Devices[2] ("MUTCD"), Section 3B.03 (Jan. 13, 2012).  *See also* MUTCD at Figure 3B-7.  These pavement markings convey that the lane "can be used by traffic in either direction as part of a left-turn maneuver."  MUTCD at Section 3B.03.

{¶ 12}  Not long after the Hyundai properly moved into the inner eastbound lane, Officer Runyan observed the vehicle's left tires drive on (or possibly over) the two-way left-turn center line for approximately two seconds.  (Tr. at 20, 31. *See also* Trial Ex. B1.)  In his report, Officer Runyan described the Hyundai's left tires as driving "on the yellow lane divider line." (Hearing Ex. 3 at ¶ 1.) In his body camera footage from the stop, Officer Runyan told Mr. Oliver: "The reason I'm pulling you over is you were riding that center line before making the transition over [to the left turn center lane]."  (Hearing Ex. 4 at 1:12.)  At the suppression hearing, Officer Runyan initially testified on direct examination that he

---

[2] Available at https://www.dot.state.oh.us/roadway/omutcd. (accessed May 4, 2023).

saw the Hyundai's left tires cross the solid yellow outer line and "hit" the broken yellow inner line of the two-way left-turn center lane. (Tr. at 15-16.) After he watched his cruiser camera video and reviewed a screenshot therefrom, Officer Runyan described the Hyundai's left tires as crossing the solid yellow line and "probably [driving] partially over the [broken yellow] line" of the two-way left-turn center lane. (Tr. at 19-21 (discussing Hearing Ex. B, Hearing Ex. B-1). *See also* Tr. at 35.)

{¶ 13} Believing he had just witnessed the Hyundai commit a second marked lanes violation, Officer Runyan initiated a stop of the car. (Tr. at 15-16, 19-21, 31-33. *See also* Hearing Ex. 3 at ¶ 1.)

### 1. The Traffic Stop

{¶ 14} The Hyundai drove within the inner eastbound lane briefly before illuminating its left-turn signal and moving into the two-way left-turn center lane without issue. (Tr. at 32.) While the Hyundai was in the process of properly turning left into a Walmart parking lot, Officer Runyan activated the overhead lights of his cruiser. (Tr. at 32-33.) The Hyundai promptly pulled over without issue. (Tr. at 19-20, 32-33.)

{¶ 15} Other than what he believed were two brief marked lanes violations, Officer Runyan did not observe the Hyundai weaving back and forth within a lane prior to the stop. (Tr. at 29, 31.) Nor did he observe any erratic lane changes or driving. (*See* Tr. at 29, 32.) Officer Runyan did not see the Hyundai abruptly brake either. (*See* Tr. at 30, 32.) And while Officer Runyan recalled seeing the Hyundai slow down when he initially encountered the car on the roadway, Officer Runyan agreed motorists often slow down because they do not want to speed in front of the police. (*See* Tr. at 28-30.)

{¶ 16} In his report, Officer Runyan wrote that he "conducted a traffic stop" of the Hyundai "for the weaving violation," i.e., a marked lanes violation under R.C. 4511.33(A). (*See* Hearing Ex. 3 at ¶ 1.) Officer Runyan's hearing testimony reflected the same. (*See* Tr. at 15-16, 33.) So too, did his body worn camera footage from that night. (*See* Hearing Ex. 4 at 1:12.)

{¶ 17} It is true Officer Runyan also claimed that, based on the two brief marked lanes violations he believed he had witnessed, Officer Runyan suspected the driver of the Hyundai might be impaired. (Tr. at 15, 28-29, 35-36. *See also* Hearing Ex. 3.) And, it is true that Officer Runyan asked Mr. Oliver about his alcohol consumption when he first

encountered Mr. Oliver in the driver's seat of the Hyundai. (*See* Hearing Ex. 4 at 1:12.) But after Mr. Oliver denied drinking any alcohol that evening (Tr. at 37), Officer Runyan did not ask him any other questions related to impairment. (*See generally* Hearing Ex. 4.) Nor did he attempt to further investigate impairment during the encounter. (*See* Tr. at 37-38. *See generally* Hearing Ex. 4.)

### 2. The Investigatory Detention

{¶ 18} Officer Runyan testified that when he approached the Hyundai, he immediately smelled "an odor of raw marijuana emanating from the open driver's window." (Hearing Ex. 3 at ¶ 2. *See also* Tr. at 16-17, 38-39.) Officer Runyan also testified that, upon smelling raw marijuana, he "already kn[e]w that [he would be] detaining everyone in that car." (Tr. at 38-39. *See also* at 41-43.) In order to detain all five people in the car, he explained, he needed assistance from at least two other officers. (Tr. at 38-39.) So, Officer Runyan radioed for backup. (Tr. at 38-39, 41-42.)

{¶ 19} While he waited for additional officers to arrive, Officer Runyan learned Mr. Oliver did not "have an ID on [him]" and did not have a license. (Hearing Ex. 4 at 1:12-1:30. *See also* Hearing Ex. 3 at ¶ 2.) Officer Runyan also discovered the Hyundai was owned by the female front passenger, who was a licensed driver but was not driving that night because she was tired. (Hearing Ex. 4 at 1:15-1:38.) Officer Runyan asked whether "anybody ha[d] IDs," and multiple passengers answered in the affirmative. (Hearing Ex. 4 at 1:45-1:51.) Officer Runyan stated he did not need the front female passenger's license because he could obtain her information "from the thing," likely referring to the Hyundai's license plate number. (Hearing Ex. 4 at 1:45-1:56.) He did not ask anyone to produce their IDs or identifying information at this time. (*See* Hearing Ex. 4 at 1:12-3:37.) Nor did he make any further inquiry into the status of Mr. Oliver's license—for instance, whether it was valid but not on Mr. Oliver's person at the time of the stop, it had expired, it had been suspended or revoked, or Mr. Oliver never had a valid driver's license. (*See* Hearing Ex. 4 at 1:12-3:37.)

{¶ 20} Instead, Officer Runyan asked Mr. Oliver—who was tapping through programs on his cell phone—why he was "so nervous." (Hearing Ex. 4 at 1:58.) After Mr. Oliver denied that he was, Officer Runyan commented: "Your hands are shaking, bro."

(Hearing Ex. 4 at 1:58-2:03.) Mr. Oliver responded by gesturing in disbelief. (*See* Hearing Ex. 4 at 2:01-2:04.) Officer Runyan's body-worn camera is unclear and inconclusive as to whether Mr. Oliver's hands were, in fact, shaking at that time. (*See* Hearing Ex. 4.)

{¶ 21} When backup officers arrived, Officer Runyan advised them of a "49 smell." (Hearing Ex. 4 at 3:26; Tr. at 41-42. *See also* Hearing Ex. 3 at ¶ 2.) At the hearing, Officer Runyan explained this was his way of conveying to the other officers (without Mr. Oliver and the other passengers knowing) that the officers would be detaining the people in the vehicle to further investigate the raw marijuana odor coming from the Hyundai. (*See* Tr. at 41-42.) Significantly, Officer Runyan repeatedly described the odor of marijuana coming *from the car*, but he never described the odor as coming *from Mr. Oliver* (or any other particular person in the car). (*See, e.g.*, Hearing Ex. 3 at ¶ 2. *See also* Tr. at 16-17, 38-39.) Officer Runyan testified that he was "looking specifically for marijuana" when he decided to remove Mr. Oliver from the vehicle and search him. (Tr. at 43. *See also* Tr. at 48.)

{¶ 22} Prior to the warrantless search of his person, Mr. Oliver (and the passengers) answered Officer Runyan's questions and were compliant with his requests. (*See* Hearing Ex. 4; Tr. at 37, 40, 49.) No one made any sudden or furtive movements, attempted to flee the scene, or acted in a hostile or threatening manner toward Officer Runyan or any other officers at the scene. (*See* Hearing Ex. 4; Tr. at 37, 40, 49.) Officer Runyan also did not ask Mr. Oliver (or any of the vehicle's occupants) whether they had weapons or drugs in their possession before he ordered Mr. Oliver to exit the vehicle for the pat-down search. (*See* Tr. at 42-44. *See generally* Hearing Ex. 4.)

### 3. The Search of Mr. Oliver's Person and Arrest

{¶ 23} At Officer Runyan's direction, Mr. Oliver exited the Hyundai and turned around. (Hearing Ex. 4 at 3:38.) At this point, two other officers were at the scene. (*See* Hearing Ex. 3 at ¶ 2.) Officer Runyan immediately handcuffed Mr. Oliver and began a pat-down search of his person. (Hearing Ex. 4 at 3:53; Tr. at 47-49.) At the suppression hearing, Officer Runyan conceded Mr. Oliver was not free to leave after he was handcuffed. (Tr. at 48.)

{¶ 24} After running his hand over Mr. Oliver's left jacket pocket, Officer Runyan testified he "felt the [marijuana] grinder and immediately knew" what it was. (Tr. at 50.) Officer Runyan pulled the grinder out of Mr. Oliver's pocket and told him: "That's what I

can smell." (Hearing Ex. 4 at 4:25.) He asked Mr. Oliver if there was any additional marijuana or other illegal drugs in the vehicle, and Mr. Oliver stated there was not. (Hearing Ex. 4 at 4:28-4:36.) Officer Runyan placed the unopened grinder on the trunk of the vehicle and continued searching Mr. Oliver's person. (Hearing Ex. 4 at 4:25; Tr. at 50.) A gun containing five rounds of ammunition in the magazine was recovered from the right pocket of Mr. Oliver's jacket, and Mr. Oliver was placed in Officer Runyan's cruiser. (Hearing Ex. 4 at 4:36; Tr. at 51. *See also* Hearing Ex. 3 at ¶ 2, 9.)

{¶ 25} After the other four passengers were removed from the Hyundai, Officer Runyan searched it for contraband. (Hearing Ex. 3 at ¶ 5.) He only recovered "minute particles of marijuana" from the car. (Hearing Ex. 3 at ¶ 5.) No "collectible amounts" of marijuana were recovered from the grinder found in Mr. Oliver's pocket or the Hyundai. (Tr. at 46.) Officer Runyan did not send any of the marijuana particles he recovered in connection with this case to the lab for testing. (Tr. at 46.) And Mr. Oliver was not charged with marijuana possession. (Tr. at 46.)

{¶ 26} Officer Runyan identified Mr. Oliver at the scene and took him into custody for felony gun charges. (*See* Hearing Ex. 3 at ¶ 4, 8, 11, 12. *See also* Tr. at 21, 51.) Officer Runyan also cited Mr. Oliver for driving without a valid license under R.C. 4510.12(A)(1) and a marked lanes violation under R.C. 4511.33(A). (Tr. at 21-22; Hearing Ex. C.)

### B. The Arguments Below and the Trial Court's Decision

{¶ 27} Following the presentation of all evidence and testimony at the suppression hearing, Mr. Oliver's counsel argued the traffic stop was "improper" because Mr. Oliver did not actually commit a marked lanes violation. (Tr. at 56-58.) In addition to arguing the prolonged detention (*Terry* stop) was an unreasonable seizure, Mr. Oliver's counsel submitted that Officer Runyan's pat-down search of Mr. Oliver's person was unreasonable in two regards. (*See* Tr. at 58-62.) *First*, the odor of raw marijuana coming from a vehicle with five occupants did not give Officer Runyan a reasonable basis to believe Mr. Oliver, himself, possessed illegal drugs. (*See* Tr. at 58-61.) *Second*, because Officer Runyan did not (and could not, based on the facts known to him at the time) reasonably believe Mr. Oliver was armed and presently dangerous, the search could not be justified as a protective pat-down for weapons under *Terry*. (*See* Tr. at 61-62.)

{¶ 28} In response, the state argued Officer Runyan had probable cause to conduct the traffic stop because he witnessed two marked lanes violations. (Tr. at 62-64.) The prosecutor also maintained the raw marijuana odor coming from the car justified the prolonged detention (*Terry* stop) of all vehicle occupants, the pat-down search of Mr. Oliver's person, and the vehicle search. (*See* Tr. at 64-67.) Contending that Officer Runyan had "reasonable suspicion to search based on the smell of marijuana," the state argued the suppression motion should be denied. (Tr. at 67.) Of note, the prosecutor never claimed the pat-down search of Mr. Oliver's person was conducted due to officer safety concerns or that Officer Runyan reasonably suspected Mr. Oliver was armed and presently dangerous— i.e., justified as a *Terry* frisk for weapons. (*Compare* Tr. at 61 *with* Tr. at 62-67.)

{¶ 29} Finding Officer Runyan's hearing testimony to be "credible in all aspects," the trial court made findings of fact in its July 19, 2021 judgment entry denying Mr. Oliver's suppression motion. (Decision and Entry at 1.) It credited Officer Runyan's testimony that he observed the Hyundai commit what he believed were two marked lanes violations (*id*. at 1), which the trial court concluded gave the officer reasonable and articulable suspicion to initiate the traffic stop. (*Id*. at 5-6).

{¶ 30} The trial court next credited Officer Runyan's testimony that he smelled raw marijuana emanating from the vehicle, which it found gave Officer Runyan a lawful basis to detain and conduct a search of Mr. Oliver's person without a warrant. (Decision and Entry at 2-3, 6-9.) Because the state did not premise the lawfulness of the frisk on officer safety concerns **or** argue the gun would have inevitably been discovered if Officer Runyan arrested Mr. Oliver for misdemeanor traffic offenses in the court below, the trial court made no findings on the applicability of either justification to the warrantless search of Mr. Oliver's person in this case.[3]

{¶ 31} After the trial court denied Mr. Oliver's suppression motion, Mr. Oliver pled "no contest" to the two fourth-degree felony gun counts as charged in the indictment.

---

[3] In its decision, the trial court stated Officer Runyan "conducted a pat down search [of Mr. Oliver] for officer safety." (Decision and Entry at 6.) But, the trial prosecutor never argued officer safety concerns justified the search, and Officer Runyan did not testify he searched Mr. Oliver due to any safety concerns. Further, the trial court's decision contains no analysis of this issue—most notably, whether Officer Runyan could reasonably have believed, under the totality of the circumstances, that Mr. Oliver was presently armed and dangerous prior to conducting the pat-down search of his person. *See Terry*, 392 U.S. at 30; *State v. Bobo*, 37 Ohio St.3d 177 (1988), paragraph two of the syllabus.

(Aug. 10, 2021 Entry of No Contest Plea.)  On August 10, 2021, the trial court sentenced Mr. Oliver to a three-year period of community control.  (Aug. 11, 2021 Jgmt. Entry.)

{¶ 32}  Mr. Oliver timely appealed and asserts the following assignment of error for our review:

> THE LOWER COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS. ALL EVIDENCE OBTAINED AS A RESULT OF THE UNLAWFUL STOP OF APPELLANT'S VEHICLE, AND UNLAWFUL SEARCH OF APPELLANT'S PERSON, VIOLATED THE FOURTH AND FOURTEENTH AMENDMENTS [TO] THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 14 AND 16 OF THE OHIO CONSTITUTION.

## II. ANALYSIS

{¶ 33}  In his sole assignment of error, Mr. Oliver challenges the constitutionality of the initial traffic stop and the warrantless search of his person.  He argues that because Officer Runyan lacked a valid justification for both, the trial court erred in overruling his motion to suppress the firearm obtained as fruit of the illegal traffic stop and/or pat-down search of his person.

### A.  Standard of Review

{¶ 34}  Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact.  *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶ 14, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. Thus, an appellate court's standard of review of a trial court's decision denying a motion to suppress is two-fold.  *See, e.g.*, *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 13 (10th Dist.), citing *State v. Reedy*, 10th Dist. No. 05AP-501, 2006-Ohio-1212, ¶ 5, citing *State v. Lloyd*, 126 Ohio App.3d 95, 100-01 (7th Dist.1998).

{¶ 35}  In ruling on a motion to suppress, the trial court first assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *See, e.g.*, *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶ 12, quoting *Burnside* at ¶ 8, *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, on appeal, we must "accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, quoting *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982).

{¶ 36} With respect to the trial court's conclusions of law, however, our standard of review is de novo. *See, e.g., Banks-Harvey* at ¶ 14, citing *Burnside* at ¶ 8; *State v. Turner*, 163 Ohio St.3d 421, 2020-Ohio-6773, ¶ 14. *See also Pilgrim* at ¶ 13. We are tasked with independently determining whether the facts satisfy the applicable legal standard. *See id.*

{¶ 37} Upon a motion to suppress evidence obtained without a warrant, the state carries the burden of showing, by at least a preponderance of the evidence, that the search and/or seizure fits within one of the defined exceptions to the warrant requirement. *See, e.g., Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988), citing *State v. Kessler,* 53 Ohio St.2d 204, 207 (1978); *Columbus v. Ellyson*, 10th Dist. No. 05AP-573, 2006-Ohio-2075, ¶ 5, citing *Athens v. Wolf,* 38 Ohio St.2d 237, 241 (1974); *State v. Brandenburg*, 12th Dist. No. CA2020-09-055, 2021-Ohio-2875, ¶ 13.

## B. Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution

{¶ 38} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, protects people against unreasonable searches and seizures. *See, e.g., Banks-Harvey* at ¶ 17, citing *United States v. Ross,* 456 U.S. 798, 825 (1982). It is a restraint on the government and, more narrowly here, law enforcement. *See id.* The Supreme Court of Ohio has held that in felony cases, Article I, Section 14 of the Ohio Constitution provides the same protection as the Fourth Amendment to the United States Constitution.[4] *Banks-Harvey* at ¶ 16, citing *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, ¶ 12.

---

[4] Although the protections afforded by Article I, Section 14 of the Ohio Constitution have historically been construed as coextensive with the protections of the Fourth Amendment to the United States Constitution, it is well-established that states may "rely on their own constitutions to provide broader protection for individual rights, independent of protections afforded by the United States Constitution." *State v. Robinette*, 80 Ohio St.3d 234, 238 (1997), citing *Arnold v. Cleveland*, 67 Ohio St.3d 35 (1993). And, in certain circumstances, the Supreme Court of Ohio has construed Article I, Section 14 of the Ohio Constitution as providing Ohio citizens with greater protections than the Fourth Amendment to the United States Constitution. *See, e.g., State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438, ¶ 23 (holding that Article I, Section 14 of the Ohio Constitution provides greater protection than the Fourth Amendment to the United States Constitution against searches and seizures made by members of law enforcement who lack authority to make an arrest); *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, ¶ 22 (holding that Article I, Section 14 of the Ohio Constitution provides greater protection than the Fourth Amendment to the United States Constitution against warrantless arrests for minor misdemeanors). *See also State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, ¶ 60, fn.3 (Donnelly, J., dissenting). *See also id.* at ¶ 14, fn. l (DeWine, J., writing for the majority).

{¶ 39} "For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant." *State v. Moore*, 90 Ohio St.3d 47, 49 (2000). "A search is unreasonable when police lack a valid warrant and no exception to the warrant requirement applies." *State v. Jackson*, ___ Ohio St.3d ___, 2022-Ohio-4365, ¶ 10, citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

{¶ 40} To safeguard the rights protected in the Fourth Amendment, the United States Supreme Court has created the exclusionary rule, which precludes the use in a criminal proceeding of evidence obtained in violation of the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 236 (2011), quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960). Evidence obtained as the result of an unconstitutional stop, arrest, and/or search must be excluded at trial as "fruit of the poisonous tree." *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963); *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, ¶ 49; *Banks-Harvey* at ¶ 25.

### C. The Warrantless Stop

{¶ 41} On appeal, Mr. Oliver asserts Officer Runyan lacked probable cause or reasonable suspicion for the initial traffic stop, making the firearm subsequently found during the warrantless search of his person inadmissible as fruit of the poisonous tree. The state argues (as it did below) Officer Runyan had probable cause *and* reasonable suspicion for the traffic stop because he witnessed Mr. Oliver commit marked lanes violations.

### 1. Legal Standards

{¶ 42} A traffic stop by a law enforcement officer must comply with the Fourth Amendment's reasonableness requirement. *See, e.g., Whren v. United States*, 517 U.S. 806, 810 (1996); *State v. Small*, 10th Dist. No. 17AP-551, 2018-Ohio-3943, ¶ 19. Courts have recognized two types of traffic stops: non-investigatory and investigatory. *See, e.g., State v. Chambers*, 5th Dist. No. 2019 AP 07 0021, 2020-Ohio-1483, ¶ 23. The lawfulness of each type is governed by a different constitutional standard. *See id.*; *State v. Ewing*, 10th Dist. No. 09AP-776, 2010-Ohio-1385, ¶ 15. To classify the type of stop—and thus, which legal standard applies—we look to the officer's basis for conducting it.

{¶ 43} First, a vehicle may be stopped when an officer witnesses a violation of the traffic code and then stops a motorist to issue a citation for the violation. *See, e.g., Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12 (1996); *Chambers* at ¶ 23; *Ravenna v. Nethken*, 11th

Dist. Case No. 2001-P-0040, 2002-Ohio-3129, ¶ 30; *Ewing* at ¶ 16. This type of non-investigatory traffic stop is justified when it is supported by probable cause. *See, e.g.*, *id*.; *Whren* at 810; *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977).

{¶ 44} Probable cause is defined in terms of "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975), quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964). It is well-established—and we agree—that when an officer personally observes what he reasonably believes to be a traffic violation, the officer has probable cause to initiate a traffic stop. *See, e.g., Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 9; *Whren* at 817-18; *Ewing* at ¶ 16; *Chambers* at ¶ 23; *Nethken* at ¶ 30. This is because such observation—made by an experienced law enforcement officer—constitutes objective evidence from which a reasonable police officer could conclude a traffic violation had occurred. *See, e.g., State v. Cronin*, 1st Dist. No. C-100266, 2011-Ohio-1479, ¶ 13. The validity of a non-investigatory traffic stop turns not on whether a traffic violation, in fact, occurred, but rather, on whether an objectively reasonable police officer would believe it did based on the totality of the circumstances. *See, e.g., Columbus v. Gullick*, 10th Dist. No. 07AP-520, 2008-Ohio-3168, ¶ 12; *Cronin* at ¶ 11.

{¶ 45} Second, a vehicle may be stopped when an officer has reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime (including a traffic violation), and then stops a motorist to confirm or refute (i.e., investigate) this suspicion of criminal activity. *See, e.g., Chambers* at ¶ 23, citing *Terry*, 392 U.S. at 21. *See also Erickson* at 6; *State v. Howell*, 1st Dist. No. C-170158, 2018-Ohio-591, ¶ 12. "Reasonable suspicion entails some minimal level of objective justification, 'that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 17 (10th Dist.), quoting *State v. Jones*, 70 Ohio App.3d 554, 556-57 (2d Dist.1990). "In evaluating reasonable suspicion to support the propriety of a stop, a reviewing court must consider the totality of the circumstances surrounding the stop as 'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. McCandlish*, 10th Dist. No. 11AP-913, 2012-Ohio-

3765, ¶ 7, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). *See also Terry* at 21-22.

{¶ 46} To determine whether a traffic stop was lawful, it is necessary to first examine the impetus behind the stop and then determine whether the stopping officer was required to have probable cause or merely reasonable and articulable suspicion of ongoing criminal activity. We emphasize that probable cause and reasonable and articulable suspicion are distinct legal standards.[5] *See, e.g.*, *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 23. Probable cause is a stricter standard than reasonable and articulable suspicion, meaning "[t]he former subsumes the latter." *Id.*, citing *State v. Evans*, 67 Ohio St.3d 405, 411 (1993).

### 2. Analysis

{¶ 47} On appeal, the state contends that Officer Runyan conducted the traffic stop for both investigatory and non-investigatory reasons. (Appellee's Brief at 12-17.)

{¶ 48} *Investigatory Stop*. The state argues the traffic stop was justified as an investigatory *Terry* stop because Officer Runyan had a reasonable basis to suspect Mr. Oliver was driving while impaired based on the time of night (approximately 12:30 a.m.) and two (possible) minor marked lanes violations. (Appellee's Brief at 15-17.) The record below does not, however, support the state's contention that Officer Runyan actually stopped Mr. Oliver to investigate what he believed to be an ongoing impaired driving offense.[6] Even if it did, the state failed to develop any argument below as to whether an

---

[5] We recognize that—at least in the context of a traffic stop conducted solely based on an officer's belief that he witnessed a motorist commit a traffic code violation that is no longer in progress—case law on the applicable legal standard is not entirely clear. *Compare Gullick*, 2008-Ohio-3168 at ¶ 10-13, *with State v. Holland*, 10th Dist. No. 13AP-790, 2014-Ohio-1964, ¶ 15-18 (applying reasonable suspicion standard to a non-investigatory traffic stop for a traffic violation). *See, e.g.*, *State v. Ellis*, 5th Dist. No. 2020CA00004, 2020-Ohio-3910, ¶ 20, quoting *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 13, quoting *Gaddis v. Redford Twp.*, 188 F.Supp.2d 762, 767 (E.D.Mich.2002) ("The Supreme Court of Ohio has observed, ' "[a]uthorities seem to be split as to whether a traffic stop is reasonable when supported merely by reasonable suspicion, or whether the heightened standard of probable cause must underlie the stop." ' "). *See also United States v. Simpson*, 520 F.3d 531, 538-41 (6th Cir.2008) ("Certain panel decisions [from the Sixth Circuit Court of Appeals] have held that reasonable suspicion is sufficient to justify a stop for a traffic violation, whereas others have stated that probable cause is required."). Because we find the traffic stop in this case was a non-investigatory traffic stop supported by probable cause, however, we do not address this nuance.

[6] Officer Runyan did not ask Mr. Oliver to submit to standardized field sobriety tests, or to provide a blood, alcohol, or breath sample. (Tr. at 38.) Nor does his report contain any observations Officer Runyan made

officer could reasonably believe a driver was impaired under these facts.[7] *See, e.g.*, *State v. Lisac*, 11th Dist. No. 2012-G-3056, 2012-Ohio-5224, ¶ 20 (deputy's observation of defendant's vehicle touching the center line did not amount to reasonable suspicion to initiate a traffic stop to investigate impairment in the absence of testimony characterizing defendant's driving as erratic, substantial weaving, or unsafe); *State v. Korman*, 11th Dist. No. 2004-L-064, 2006-Ohio-1795, ¶ 15 ("[A] 'de minimis' marked lane violation, standing alone, does not necessarily rise to the level of reasonable suspicion that the operator of the vehicle is impaired."). Generally, an appellate court will not consider a legal theory or issue a party failed to raise in the trial court. *See, e.g., State ex rel. Zollner v. Indus. Comm.*, 66 Ohio St.3d 276, 278 (1993), citing *State ex rel. Gibson v. Indus. Comm.*, 39 Ohio St.3d 319 (1988) ("A party who fails to raise an argument in the court below waives his or her right to raise it here."). And, on appeal, the state presents no authority or arguments in support of its unsubstantiated assertion that Officer Runyan stopped Mr. Oliver to investigate impairment. Thus, pursuant to App.R. 12(A)(2) and 16(A)(7), we may disregard such arguments—which we believe is appropriate here. *See, e.g., Columbus v. Cort*, 10th Dist. No. 19AP-425, 2020-Ohio-1467, ¶ 34.

---

about Mr. Oliver—e.g., slurred speech, bloodshot eyes, comprehension difficulties, or odor of any substance emanating from Mr. Oliver—that would suggest Officer Runyan was investigating Mr. Oliver for impaired driving after he initiated the traffic stop. (*See generally* Hearing Ex. 3.) Further, his report does not contain any impairment-related "plain view" observations Officer Runyan made before searching Mr. Oliver's person—e.g., empty beer cans, marijuana shake, or drug paraphernalia visible in the car. (*See generally id.*)

[7] In closing arguments, Mr. Oliver's counsel proffered that Officer Runyan's minimal investigation into impairment during the traffic stop suggested the stop was pretextual. (*See* Tr. at 57-58.) Although Officer Runyan testified that, based on his observations of Mr. Oliver's driving, he "suspect[ed] enough to stop" the Hyundai to investigate whether the driver was impaired (*id.* at 28-29, 35), the state never argued below that Officer Runyan conducted the traffic stop to investigate suspected impairment. Mr. Oliver's counsel thus did not challenge at the hearing whether it was reasonable for Officer Runyan to suspect impairment based solely on the two minor marked lanes violations Officer Runyan believed he witnessed that night. (*Id.* at 57-58.) In its decision, the trial court referenced Officer Runyan's testimony that he suspected Mr. Oliver "was intoxicated from the manner in which [Mr. Oliver] was driving, which included a clear marked lanes violation." (Decision and Entry at 8.) Since the state did not argue below that the traffic stop was conducted to investigate impairment, however, the decision contains no analysis on whether it was reasonable for Officer Runyan to suspect Mr. Oliver was impaired based on two brief marked lanes violations, and in the absence of any testimony characterizing Mr. Oliver's driving as erratic or unsafe. *Compare with State v. Lisac*, 11th Dist. No. 2012-G-3056, 2012-Ohio-5224, ¶ 20.

{¶ 49} *Non-Investigatory Stop.* The state primarily contends that the traffic stop was justified as non-investigatory stop because Officer Runyan actually witnessed (or had a reasonable basis to believe he had witnessed) Mr. Oliver commit a marked lanes infraction, in violation of R.C. 4511.33(A)(1). At the suppression hearing and in his written report, Officer Runyan indicated he stopped the vehicle Mr. Oliver was driving for "weaving," i.e., committing at least one marked lanes violation. (Tr. at 15-16, 20-23, 33; Hearing Ex. 3 at ¶ 1.) We note the traffic stop occurred after the alleged marked lanes violations were completed. (Tr. at 15-16, 28-34. *See generally* Hearing Ex. 1.)

{¶ 50} On these facts and the record before us, and based on the totality of the circumstances, we find the impetus for the traffic stop in this case was Officer Runyan's observations of what he believed were two completed marked lanes violations. And this finding is not generally in dispute. Instead, Mr. Oliver argues the traffic stop was unconstitutional because he did not actually commit a marked lanes violation. This is because, he contends, a vehicle's tire must drive completely over (as opposed to merely on) a marked lane line to constitute a marked lanes violation under R.C. 4511.33(A)(1). In support, he cites to *State v. Turner*, 163 Ohio St.3d 421, 2020-Ohio-6773 and other cases from Ohio appellate courts generally holding that a marked lanes violation occurs only when a vehicle's tire completely crosses a marked lane line. (*See* Appellant's Brief at 14-16.) Mr. Oliver thus argues the trial court erred in both its application of Ohio's marked lanes law and in finding that Officer Runyan's traffic stop was justified. (*Id.* at 12-19.)

{¶ 51} We reiterate that reasonable suspicion is not sufficient to justify a non-investigatory traffic stop, because a non-investigatory traffic stop must be supported by probable cause. *See, e.g., Chambers*, 2020-Ohio-1483 at ¶ 23, citing *Whren*, 517 U.S. at 810, and *Mimms*, 434 U.S. at 109. Accordingly, we confine our analysis of the traffic stop in this case to the "typical non[-]investigatory stop that officers perform after witnessing specific traffic violations, premised on probable cause." *State v. Hampton*, 1st Dist. No. C-210423, 2022-Ohio-1380, ¶ 8.

### a. To violate R.C. 4511.33(A)(1), a vehicle's tires must completely cross a lane divider line

{¶ 52} R.C. 4511.33(A)(1) requires drivers traveling on roads with two or more lanes to drive "as nearly as is practicable, entirely within a single lane or line of traffic" and

prohibits drivers from "mov[ing] from such lane or line until the driver has first ascertained that such movement can be made with safety." "[W]hen an officer could reasonably conclude from a person's driving outside the marked lanes that the person is violating a traffic law, the officer is justified in stopping the vehicle."[8] *Mays*, 2008-Ohio-4539 at ¶ 20.

{¶ 53} In *State v. Turner*, the Supreme Court of Ohio held that "the single solid white longitudinal line on the right-hand edge [of] a roadway—the fog line—marks the edge of the roadway and that such a marking merely 'discourages or prohibits' a driver from 'crossing' it, not 'driving on' or 'touching it.' " 2020-Ohio-6773 at ¶ 37, citing MUTCD Section 3A.06(B). In reaching its decision, the court noted that "[t]his interpretation of R.C. 4511.33(A)(1) is consistent with the greater weight of authority in jurisdictions across the nation that touching the single solid white longitudinal line on the right-hand side of the roadway does not constitute a violation of R.C. 4511.33(A)(1)." (Citations omitted.) *Id.* at ¶ 36.

{¶ 54} The state is correct in noting that *Turner* was decided after the traffic stop in this case occurred. (*See* Appellee's Brief at 16.) But that fact has little relevance to our analysis here. When Mr. Oliver was stopped on August 18, 2019, all of the district courts of appeals that had thus far addressed this issue—the First, Third, Fifth, Sixth, and Eleventh Districts—had held that touching or driving on the fog line does not constitute a violation of R.C. 4511.33(A)(1). (Citations omitted.) *See Turner* at ¶ 11. On September 30, 2019— over a month ***after*** Mr. Oliver was stopped—the Twelfth District Court of Appeals issued its decision holding otherwise, which created the conflict that would ultimately be resolved by the Supreme Court in *Turner*. *See id*. at ¶ 9.

{¶ 55} Mr. Oliver attributes error to the trial court's decision not to extend *Turner's* holding to pavement lane lines other than the fog line. (Appellant's Brief at 12-16.) We cannot say this was error, however, as the *Turner* court made clear its holding did not

---

[8] The state relies, in part, on the Supreme Court of Ohio's decision in *Mays*, 2008-Ohio-4539, to support its argument. However, the facts, procedural posture, and issues presented in *Mays* differ substantially from those underlying this case. Thus, we find the analysis of the traffic stop in *Mays* not to be relevant to our determination of the issues presented here. We note, though, that although the *Mays* court used the reasonable suspicion legal standard to evaluate the constitutionality of the traffic stop in that case, under the relevant facts in *Mays*—trooper observed defendant's vehicle cross over the white fog line twice—the trooper's objectively reasonable belief that he witnessed a marked lanes violation would have also given him probable cause to conduct a non-investigatory traffic stop of the vehicle. *See, e.g.*, *Godwin*, 2006-Ohio-3563 at ¶ 9; *Whren*, 517 U.S. at 817-18; *Cronin*, 2011-Ohio-1479 at ¶ 13.

address other cases involving vehicles driving on or touching any other lane lines. *See Turner*, 2020-Ohio-6773 at ¶ 12. Of note, those cases not addressed in *Turner*—which all predated the traffic stop in this case—generally stood for the proposition that R.C. 4511.33(A)(1) is violated only when a vehicle's tire ***completely crosses over*** a lane line. *See id.*, citing *State v. Franklin*, 5th Dist. No. 11-CA-128, 2012-Ohio-3089, ¶ 21; *State v. Richardson*, 5th Dist. No. 00-CA-A-01-003, 2000 Ohio App. LEXIS 3419 (July 14, 2000); *State v. Konneh*, 6th Dist. No. WD17-007, 2018-Ohio-1239, ¶ 26; *State v. Grigoryan*, 8th Dist. No. 93030, 2010-Ohio-2883, ¶ 25.

{¶ 56} To determine the constitutionality of the traffic stop in this case, however, our inquiry is not whether any marked lanes violations actually occurred. *See, e.g.*, *State v. Bahen*, 10th Dist. No. 16AP-65, 2016-Ohio-7012, ¶ 22. Nor are we tasked with evaluating whether the state satisfied its burden of proving all elements of a marked lanes infraction under R.C. 4511.33(A)(1)—including the "practicability" and "safety" components referenced in the statute. The primary issue before us is whether Officer Runyan had probable cause to believe Mr. Oliver violated the marked lanes statute when he initiated the traffic stop. The trial court found that he did.[9] We agree.

### b. Officer Runyan had probable cause to conduct a non-investigatory traffic stop

{¶ 57} Before addressing the specifics of Mr. Oliver's argument that the trial court erred in finding Officer Runyan had probable cause to conduct a traffic stop, we will address the trial court's factual findings concerning the constitutionality of the traffic stop.

{¶ 58} The trial court found Officer Runyan "observed ***two*** marked lanes violations." (Emphasis added.) (Decision and Entry at 1.) Although we disagree (at least in part) with that finding, we again reiterate that, when a defendant challenges the validity of a non-investigatory stop, "the focus is not on whether [the defendant] could have been stopped because a traffic violation had in fact occurred, but on whether the officer had

---

[9] In denying Mr. Oliver's suppression motion, the trial court concluded that "Officer Runyan had a reasonable and articulable suspicion to initiate the traffic stop." (Decision and Entry at 6.) Yet, in the same judgment entry, the trial court found that Officer Runyan "observed two marked lane violations" (*id.* at 1), which would suggest the trial court actually found Officer Runyan had probable cause to make the non-investigatory traffic stop.

probable cause to believe an offense had occurred." *See, e.g.*, *Gullick*, 2008-Ohio-3168 at ¶ 12.

{¶ 59} With regard to the first alleged violation, Officer Runyan testified he observed the Hyundai's tires briefly drive ***on***—but not cross—the lane divider (broken white) line. His cruiser video supported that testimony, and his report indicated that, at the time of the stop, he perceived the vehicle's tires as driving on—but not over—the lane divider line. Since R.C. 4511.33(A)(1) is not violated when a vehicle's tire drives on—but not over—a lane divider line, competent, credible evidence does not support the trial court's finding that Officer Runyan witnessed an actual marked lanes violation when he saw the vehicle's tires drive on the lane divider line. Based on the facts and circumstances known to Officer Runyan at the time of the traffic stop (the vehicle's tires drove on the line for approximately one second), we find a prudent person would not be warranted in believing a marked lanes violation involving the lane divider line had occurred. *Gullick* at ¶ 10, citing *Beck*, 379 U.S. at 91.

{¶ 60} Our analysis of the second alleged marked lanes violation is not as simple. The state alleges Mr. Oliver violated the statute by briefly driving the Hyundai's tires on or over the center left-turn lane lines. Center left-turn lanes are designated by double yellow lane lines—the outer line is solid and the inner line is broken.

{¶ 61} In his written report, Officer Runyan described the Hyundai's left tires as driving "on the yellow lane divider line." (Hearing Ex. 3 at ¶ 1.) As depicted in his body camera footage, Officer Runyan told Mr. Oliver: "The reason I'm pulling you over is you were ***riding*** that center line before making the transition over [to the left turn center lane]." (Emphasis added.) (Hearing Ex. 4 at 1:12.) Neither suggest Officer Runyan believed, at the time of the stop, he witnessed the Hyundai's tires completely cross either line.

{¶ 62} At the suppression hearing, however, Officer Runyan initially testified on direct examination that he saw the Hyundai's left tires cross the solid yellow outer line and "hit"—i.e., drive on—the broken yellow inner line of the two-way left-turn center lane. (Tr. at 15-16.) After he watched his cruiser camera video and reviewed a screenshot therefrom, Officer Runyan described the Hyundai's left tires as crossing the solid yellow line and

"probably [driving] partially over the [broken yellow] line" of the two-way left-turn center lane. (Tr. at 19-21, discussing Hearing Ex. B, Hearing Ex. B-1. *See also* Tr. at 35.)

{¶ 63} In its decision, the trial court found the "vehicle drifted to the left and the driver's side tire drove over the solid yellow lane divider." (Decision and Entry at 1.) It did not make any findings concerning the broken yellow inner lane line. In other words, the trial court did not find the tires crossed both the solid yellow outer lane line and the dashed yellow inner lane line, which, together, designated the center left-turn lane.

{¶ 64} Based on our independent review of the cruiser camera video, and in light of Officer Runyan's testimony (found by the trial court to be credible "in all aspects"), we find that competent, credible evidence supports the finding that the Hyundai's tires completely crossed the solid yellow outer lane line, but only touched the broken yellow inner lane line.

{¶ 65} We have recognized that, "[g]enerally, crossing the double-yellow lines is a violation of R.C. 4511.33(A)(1)." *Koepke v. Metro. Property and Cas. Ins. Co.*, 10th Dist. No. 16AP-601, 2017-Ohio-4084, ¶ 19, citing *State v. Wooten*, 11th Dist. No. 2004-L-084, 2006-Ohio-199, ¶ 20, and *State v. Salter*, 8th Dist. No. 83194, 2004-Ohio-4086, ¶ 10. And other Ohio courts have generally held that an officer has reasonable and articulable suspicion to stop a driver when an officer observes a vehicle's driver's side tires completely cross the double solid yellow centerline to the point that the tires were not touching the lines. *See, e.g., State v. Landon*, 5th Dist. No. 09-CA-0009, 2009-Ohio-6818; *State v. Powers*, 6th Dist. No. L-04-1210, 2005-Ohio-5737, ¶ 15; *State v. Wooten*, 11th Dist. No. 2004-L-084, 2006-Ohio-199, ¶ 20; *State v. Bigley*, 9th Dist. No. 02CA0017-M, 2002-Ohio-4149, ¶ 16.

{¶ 66} Ohio case law is not clear on whether an officer has a lawful basis to stop a vehicle for violating R.C. 4511.33(A)(1) when the marked lane at issue is designated by a set of double lines and the testimony and evidence establish that a vehicle's tires completely crossed one line but only touched the other line. *Compare State v. Marcum*, 5th Dist. No. 12-CA-88, 2013-Ohio-2652 (affirming trial court's decision granting defendant's suppression motion on grounds that the officer had no basis to stop defendant for violating R.C. 4511.33 when the officer witnessed the vehicle's tires drive on, but not completely cross, both of the double solid yellow pavement lines), *with State v. Burton*, 12th Dist. No. CA2005-12-528, 2006-Ohio-4048, ¶ 3, 9 (finding the officer had probable cause to stop

defendant for marked lanes violation when the officer testified he saw vehicle's tires drive on but not completely cross both of the double yellow lines); *State v. Thayer*, 9th Dist. No. 11CA0045-M, 2012-Ohio-3301, ¶ 16-22 (finding traffic stop for violating R.C. 4511.25 was "reasonable" even though trooper testified defendant drove on, but did not cross, the double yellow lines); and *State v. Slider*, 11th Dist. No. 2007-P-0096, 2008-Ohio-2318,¶ 35 (concluding defendant's driving on the center line on a dark two-lane road on four separate occasions, as personally observed by a trooper, provided the trooper with probable cause that defendant violated R.C. 4511.33).

{¶ 67} We have not previously had the occasion to explicitly address this issue. Nor has the Supreme Court of Ohio. And, the parties in this case do not present arguments or authority regarding this precise issue.[10] Because it is not the duty of this court to develop an argument not raised in support of an assignment of error—even if one might exist—we decline to render any opinion on whether a vehicle's tire must cross both double lane lines to violate R.C. 4511.33(A)(1). *See, e.g.*, *State v. Williams*, 10th Dist. No. 02AP-507, 2003-Ohio-2694, ¶ 54. *See also* App.R. 12(A)(2); App.R. 16(A)(7); *State v. Brown*, 6th Dist. No. L-18-1140, 2020-Ohio-1650, ¶ 62 (Osowik, J., dissenting) ("It is not the proper role or scope of this intermediary court to act in the place of the counsel of either party to this appeal.")

{¶ 68} Based on the foregoing—and in the absence of binding precedent, or even persuasive authority, clearly stating otherwise—we find that under the facts of this particular case, Officer Runyan had probable cause to believe Mr. Oliver committed a marked lanes violation when he observed the Hyundai's tires cross the solid yellow line and touch the dashed line. Given Officer Runyan's testimony and the cruiser video, and irrespective of whether Mr. Oliver actually violated R.C. 4511.33(A)(1), the facts and circumstances in this case—in the absence of arguments contending otherwise—were " 'sufficient to warrant a prudent man in believing that [Mr. Oliver] had committed or was committing [a marked lanes] offense,' " thus justifying the stop. *Gerstein*, 420 U.S. at 111, quoting *Beck*, 379 U.S. at 91. *See, e.g.*, *State v. Salsbury*, 10th Dist. No. 07AP-321, 2007-

---

[10] Although Mr. Oliver generally argued that R.C. 4511.33 was not violated in this case, he never raised below the issue of whether an officer has a lawful basis to stop a vehicle when the marked lanes violation involves a set of double lines, and the testimony and evidence establish the vehicle's tires crossed one line but only touched the other line. The trial court did not address this issue in its decision. And Mr. Oliver does not specifically raise this issue on appeal.

Ohio-6857, ¶ 6 (explaining even where evidence is insufficient to support a marked lanes conviction, it may still support probable cause to initiate a traffic stop); *Godwin*, 2006-Ohio-3563 at ¶ 15 ("[T]he fact that appellee could not be convicted of failure to obey a traffic-control device is not determinative of whether the officer acted reasonably in stopping and citing him for that offense. Probable cause does not require the officer to correctly predict that a conviction will result.")

{¶ 69} This finding remains true even though there was no testimony elicited from Officer Runyan at the suppression hearing about the circumstances surrounding Mr. Oliver's failure to maintain his lane of travel—i.e., traffic, weather or road conditions, where the rumble strips were located in relation to the marked lane, or anything else to indicate why it was not practicable for Mr. Oliver to remain within the lane as contemplated by R.C. 4511.33(A)(1). *Compare with State v. Shaffer*, 3d Dist. No. 11-13-02, 2013-Ohio-3581 (holding that, in the absence of officer testimony or evidence as to the "practicability" of the motorist safely remaining in the lane of travel, the record does not support a reasonable, articulable suspicion to justify a traffic stop for a marked lanes violation under R.C. 4511.33(A)(1)). Officer Runyan's cruiser camera video recording, which was introduced into evidence at the suppression hearing, depicted the entire approach of the Hyundai; the weather, traffic, and road conditions; and the circumstances giving rise to the stop. (*See* Hearing Ex. B, 1). The video recording constitutes " 'evidence in the record from which [a] legitimate inference can be drawn' that there was no apparent reason why it was impracticable for [Mr. Oliver] to remain [in] his lane.' " *See State v. Yost*, 3d Dist. No. 13-18-03, 2018-Ohio-2873, ¶ 18-24, quoting *Shaffer* at ¶ 26 (holding that although officer did not testify about "practicability," cruiser camera video recording in the record was sufficient to address the element of practicability set forth in R.C. 4511.33(A)(1)).

{¶ 70} Accordingly, Mr. Oliver's arguments relating to the traffic stop are not well-taken. For the forgoing reasons, we do not find error in the trial court's conclusion that Officer Runyan had probable cause to conduct a traffic stop of the vehicle.

## D. The Warrantless Search of Mr. Oliver's Person

{¶ 71} As part of his sole assignment of error, Mr. Oliver also contends that, even if Officer Runyan had a valid basis for the traffic stop, the officer did not have a lawful basis

to search his person. He argues the firearm was inadmissible as fruit of the illegal pat-down search, and the trial court erred in failing to suppress it.

{¶ 72} "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." (Footnote omitted.) *Katz v. United States*, 389 U.S. 347, 357 (1967). When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement. *Athens v. Wolf*, 38 Ohio St.2d 237, 241 (1974).

{¶ 73} In the trial court, the state argued the search of Mr. Oliver's person was justified because Officer Runyan detected the odor of raw marijuana coming from the vehicle. (*See* Tr. at 62-67; May 25, 2021 Memo. Contra.) The trial court agreed, finding that "Officer Runyan could have objectively reasonably [sic] relied upon the plain smell standard set forth in *Moore* in detaining[11] and searching [Mr. Oliver]." (Decision and Entry at 9.)

{¶ 74} However, on appeal, the state advances new justifications for the search. It argues the pat-down search of Mr. Oliver's person was justified as a protective *Terry* frisk for weapons. (Appellee's Brief at 21-33.) The state also contends the inevitable discovery doctrine applies because Officer Runyan had probable cause to arrest Mr. Oliver for either driving without a valid license or a minor misdemeanor marked lanes violation at the time of the frisk. (Appellee's Brief at 33-38.) Neither argument was made in the trial court. (*See, e.g.*, Tr. at 62-67; May 25, 2021 Memo. Contra.) As a result, the trial court did not make any findings on the lawfulness of the search as a *Terry* frisk or whether Officer Runyan had probable cause to arrest Mr. Oliver prior to the pat-down.

{¶ 75} Mr. Oliver argues the trial court erred in finding the odor of raw marijuana coming from a car with five occupants justified Officer Runyan's warrantless pat-down search of Mr. Oliver's person. In its decision, the trial court referenced the "plain smell" doctrine but conflated legal standards that are not relevant here. (*See* Decision and Entry

---

[11] Although Mr. Oliver also challenged the constitutionality of his prolonged detention (*Terry* stop) in the trial court, he does not maintain that challenge on appeal.

at 6-9). And, although the state conceded at oral argument it was not advancing some of the legal theories in the trial court's decision, we nonetheless will address both the trial court's analysis and the state's new contentions on appeal relating to the warrantless search of Mr. Oliver's person.

> **1. Mr. Oliver did not challenge the search of the vehicle and Officer Runyan never claimed he detected the odor of marijuana emanating from Mr. Oliver's person**

{¶ 76} In the trial court, the state maintained that the search of Mr. Oliver's person was "based on the smell of marijuana." (*See* Tr. at 64-67; May 25, 2021 Memo. Contra at 2.) At the conclusion of the suppression hearing, the prosecutor explicitly stated that the odor of marijuana "was the reason for the searching [of] the people." (*Compare* Tr. at 61; Appellee's Brief at 40, *with* Tr. at 64-67.)

{¶ 77} In ruling upon the validity of Officer Runyan's warrantless search of Mr. Oliver's person, the trial court misapplied the holding of *State v. Moore*, 90 Ohio St.3d 47 (2000). (*See* Decision and Entry at 7-9.) Relying on *Moore*, the trial court found the warrantless search of Mr. Oliver's **person** was lawful because Officer Runyan smelled raw marijuana **in the car**. (Decision and Entry at 7-9.) But *Moore* does not support such application.

{¶ 78} In *Moore*, the Supreme Court of Ohio certified the following issue for review: "[i]s the odor of **burnt** marijuana, alone, sufficient to provide probable cause to search a defendant's **motor vehicle**." (Emphasis added. *Id*. at 48. The *Moore* court broadly held that "the smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to search a motor vehicle, pursuant to the automobile exception to the warrant requirement." *Id*. By affirming the trial court's decision to deny the motion to suppress, the *Moore* court also held that "exigent circumstances existed to justify the warrantless search of defendant's person once [law enforcement] had probable cause based upon the odor of marijuana detected **on the defendant**," who was the sole occupant of the vehicle. (Emphasis added.) *Id*.

{¶ 79} When *Moore* was decided in 2000, marijuana (cannabis) could not be legally possessed or used in any form in Ohio. But, at the time of the traffic stop in this case, it could be legally possessed and used in certain circumstances. This is because the Ohio

General Assembly legalized medical marijuana[12] and hemp[13] prior to August 18, 2019. Mr. Oliver thus contends that Officer Runyan could not—based solely on the odor of raw marijuana coming from the car—ascertain the legality of the odor's source.[14] (Appellant's Brief at 50-57. *See also* Appellant's Reply at 12-16.) Mr. Oliver postures on appeal that *Moore*'s core inference—the mere odor of cannabis provides inherent evidence of criminal activity—is no longer viable under the current legislative framework. (*See* Appellant's Brief at 45-59. *See also* Appellant's Reply at 12-16.) We do not need to reconcile *Moore*'s core inference with these legislative enactments, however, to resolve this case.

{¶ 80} An officer's detection of the odor of marijuana in a car does not, alone, establish probable cause sufficient to search an occupant of that car without a warrant. It is well-established that probable cause for a search of a person must be "particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). *Compare Moore* at 48 (strong odor of burnt marijuana also detected on defendant's clothing) and *State v. Maddox*, 10th Dist. No. 19AP-72, 2021-Ohio-586, ¶ 21 (defendant was the sole occupant of the vehicle and voluntarily surrendered marijuana), *with State v. Johnson*, 10th Dist. No. 08AP-990, 2009-Ohio-3436, ¶ 20 (no evidence that marijuana odor was detected on defendant's person and other occupant of vehicle admitted the marijuana blunt in plain

---

[12] Effective September 8, 2016, medical marijuana became legal in Ohio. *See* 2016 Sub.H.B. No. 523 ("House Bill 523"). R.C. 3796.06 and Ohio Adm.Code 3796:7-2-05 set forth the framework for how a person can lawfully possess and use prescribed marijuana plant material.

[13] Effective July 30, 2019, hemp became legal in Ohio. *See* 2019 Am. Sub.S.B. No. 57 ("Senate Bill 57"). "Hemp" is defined as cannabis containing a delta-9 tetrahydrocannabinol ("THC") concentration of not more than 0.3% on a dry weight basis. R.C. 928.01(C).

[14] R.C. 3796.06(A)(3) allows possession of prescribed marijuana plant material. However, while a person holding a valid marijuana license can possess plant marijuana, Ohio Adm.Code 3796:7-2-05(G)(2) requires medical marijuana to be maintained only in the containers approved in subsection (G). Ohio Adm.Code 3796:7-2-05(E) also requires that medical marijuana be kept "in a secure location so as to prevent theft, loss, or access by persons not authorized" to possess medical marijuana. If an officer observes marijuana that is not stored in accordance with these requirements, the officer could reasonably infer the marijuana is illegally possessed (even if it was legitimate medical marijuana). *See, e.g.*, *State v. Burke*, 2d Dist. No. 29256, 2022-Ohio-2166, ¶ 37. In addition, if an officer smells burnt marijuana, or a person admits to smoking marijuana, the officer could reasonably infer illegality notwithstanding the possibility that the person under investigation had a medical marijuana license. Although R.C. 3796.06(A)(3) allows for the possession of medical marijuana "plant material," section (B)(1) of the statue prohibits "the smoking or combustion of medical marijuana." The odor of burnt marijuana is indicative of smoking and therefore a violation of R.C. 3796.06(B)(1). *See, e.g.*, *State v. Grant*, 2d Dist. No. 2022-CA-6, 2022-Ohio-2601, ¶ 22; *State v. Caldwell*, 12th Dist. No. CA2021-02-017, 2021-Ohio-3777, ¶ 19.

view belonged to him) and *State v. Taylor,* 8th Dist. No. 94853, 2011-Ohio-1554, ¶ 24-25 (no evidence of marijuana in the car or that defendant herself smelled of marijuana). "This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search * * * the [place] where the person may happen to be." *Ybarra* at 91. *See also Johnson* at ¶ 14 ("Probable cause to search one location (the car) does not automatically result in probable cause to search another location ([defendant's] pockets."). "As the *Moore* court noted, even in cases where probable cause for a vehicle search exists, law enforcement must independently justify a [warrantless] search of the vehicle operator or other occupants." *Maddox* at ¶ 21, citing *Moore* at 52 (citing examples of exigent circumstances).

{¶ 81} Based on the odor of raw marijuana coming from the car, Officer Runyan suspected narcotics might be present in it. Unlike in *Moore,* however, Officer Runyan never claimed he detected the odor of raw marijuana emanating from ***Mr. Oliver's clothing or person*** prior to searching Mr. Oliver. *Compare with Maddox* at ¶ 21; *Johnson* at ¶ 20; *Taylor* at ¶ 25. Officer Runyan also did not claim to see any marijuana-related contraband before he frisked Mr. Oliver. *Compare with id.* And, because he did not ask any of the vehicle's occupants about the marijuana odor before searching Mr. Oliver, Officer Runyan did not gain any insights through investigation—e.g., admissions or voluntary surrenders—concerning which of the five occupants might actually be in possession of the raw marijuana he smelled. *Compare with Maddox* at ¶ 21-22.

{¶ 82} Since Officer Runyan did not testify he could reasonably attribute the odor of raw marijuana to any one of the five people in the car before he searched Mr. Oliver, it is apparent that his suspicion was not particularized to Mr. Oliver. Rather, it encompassed all occupants based on their mere presence in the vehicle. But Mr. Oliver's mere presence in the car did not, under the particular facts and circumstances presented in this case, provide Officer Runyan with probable cause to believe Mr. Oliver possessed marijuana at the time he was searched. Accordingly, we find that Officer Runyan did not have probable cause to search Mr. Oliver's person based solely on the odor of raw marijuana emanating from the

car. Based on this determination, we need not make any proclamations regarding the present-day value of *Moore*'s core inference.[15]

### 2. The state did not argue in the trial court that the pat-down search of Mr. Oliver's person was justified as a protective frisk for weapons, thus waiving this issue for the purposes of appeal

**{¶ 83}** On appeal, the state's main contention is that Officer Runyan's pat-down search of Mr. Oliver's person was justified as a protective frisk for weapons under *Terry v. Ohio*. (Appellee's Brief at 21-33.)

**{¶ 84}** An officer may perform a pat-down of a suspect's outer clothing to protect the safety of himself and others. *Terry*, 392 U.S. at 30. The purpose of such a *Terry* frisk is "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). A frisk is lawful if the investigative stop itself is lawful, and if the officer harbors an objectively reasonable belief that a particular individual is "armed and presently dangerous." *Terry* at 24. *See also State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, ¶ 9; *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983) ("[P]olice may order persons out of an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous.").

**{¶ 85}** Even when an investigatory stop and detention are justified under *Terry*, it does not necessarily follow that a frisk for weapons is also warranted. *See, e.g., State v. Bradford*, 10th Dist. No. 14AP-322, 2014-Ohio-5527, ¶ 25; *State v. Martin*, 2d Dist. No. 20270, 2004-Ohio-2738, ¶ 14. An officer must have a reasonable, objective, and individualized suspicion that the particular suspect is armed and presently dangerous under the totality of the circumstances before the officer may conduct a pat-down search for weapons. *See Bradford* at ¶ 25, citing *Andrews*, 57 Ohio St.3d at 89; *State v. Bobo*, 37 Ohio St.3d 177, 180-81 (1988); *Terry* at 24-25; *Johnson* at 326-27. The officer need not be absolutely certain that the individual is armed; rather, the issue is whether the officer can

---

[15] The trial court also relied on the automobile exception to the warrant requirement when it ruled on Mr. Oliver's suppression motion. (*See* Decision and Entry at 7.) This exception pertains to warrantless searches of vehicles—not people. *See, e.g., Maddox*, 2021-Ohio-586 at ¶ 15. It has no application to the issues presented in this case because Mr. Oliver does not challenge on appeal the constitutionality of the vehicle search that occurred after Officer Runyan searched Mr. Oliver's person.

articulate specific facts that would warrant a reasonably prudent man in those circumstances to believe his safety, or the safety of others, is in danger. *See, e.g., Terry* at 27; *Johnson* at 326-27; *Bennett v. Eastpointe*, 410 F.3d 810, 822 (6th Cir.2005).

{¶ 86} With these legal standards in mind, a review of the record in this case reveals the state never claimed the search of Mr. Oliver's person was a lawful protective search for weapons under *Terry* in the court below. Because it did not make this argument in the trial court, we find the state has waived that argument for the purposes of this appeal.

{¶ 87} It is well-established that a party cannot raise new issues or legal theories for the first time on appeal. *See, e.g., State v. Atchley*, 10th Dist. No. 07AP-412, 2007-Ohio-7009, ¶ 8, citing *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43 (1975). *See, e.g., State ex rel. Zollner v. Indus. Comm.*, 66 Ohio St.3d 276, 278 (1993), citing *State ex rel. Gibson v. Indus. Comm.*, 39 Ohio St.3d 319, 320 (1988) ("A party who fails to raise an argument in the court below waives his or her right to raise it here."). This means that a litigant's failure to raise an issue before the trial court generally waives the litigant's right to raise that issue on appeal. *See, e.g., State v. Dunlap*, 10th Dist. No. 05AP-260, 2005-Ohio-6754, ¶ 7; *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, ¶ 30 ("an appellant generally may not raise an argument on appeal that the appellant has not raised in the lower courts"); *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 21 (defendant forfeited constitutional challenge by failing to raise it during trial court proceedings); *Gibson v. Meadow Gold Dairy*, 88 Ohio St.3d 201, 204 (2000) (party waived arguments for purposes of appeal when party failed to raise those arguments during trial court proceedings).

{¶ 88} When a defendant moves to suppress evidence obtained through a warrantless search, the state bears the ultimate burden of establishing that the search falls into one of the exceptions to the warrant requirement. *State v. Wintermeyer*, 158 Ohio St.3d 513, 2019-Ohio-5156, ¶ 18, citing *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). The Supreme Court of Ohio has held that before the state is put to this burden, however, the defendant must assert the grounds upon which he intends to challenge the validity of the search. *Id.*, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988); *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, ¶ 10. *See also Atchley* at ¶ 8; *State v. Turner*, 12th Dist. No. CA2018-11-082,

2021-Ohio-541, ¶ 12-14 (state not permitted to assert a new justification for the validity of the traffic stop for the first time on appeal). " 'By requiring the defendant to state with particularity the legal and factual issues to be resolved, the prosecutor and court are placed on notice of those issues to be heard and decided by the court and, by omission, those issues which are otherwise being waived.' " *Wintermeyer* at ¶ 18, quoting *State v. Shindler*, 70 Ohio St.3d 54, 58 (1994). *See also Atchley* at ¶ 8, citing *Xenia* at 218.

{¶ 89}   Here, Mr. Oliver argued in his first suppression motion that the warrantless search was not a lawful frisk for weapons under *Terry* "because the officers lacked an objectively reasonable belief that Mr. Oliver was armed and dangerous." (May 13, 2021 Mot. at 9.) Further, a review of the hearing transcript likewise demonstrates that Mr. Oliver's counsel presented arguments as to why the trial court should find the pat-down search was not justified as a *Terry* frisk. (*See* Tr. at 59-62.) The state filed no written argument below claiming the pat-down search was justified under *Terry*. (*See* May 25, 2021 Memo. Contra.) And, the trial prosecutor never argued at the suppression hearing that Officer Runyan searched Mr. Oliver's person out of officer safety concerns or because he believed Mr. Oliver was armed and presently dangerous. (Tr. at 62-67.) More precisely, the state never contended below that the trial court should find the pat-down search was permitted by *Terry*.

{¶ 90}   At the hearing, Officer Runyan did not testify that he believed Mr. Oliver to be armed and dangerous prior to the pat-down search. Nor did Officer Runyan testify that he searched Mr. Oliver due to "officer safety" concerns. To the contrary, Officer Runyan repeatedly stated that he searched Mr. Oliver's person because he was looking for marijuana, not firearms. (*See, e.g.*, Tr. at 43, 48-49. *See also* Hearing Ex. 3 at ¶ 2.) This testimony thus belies the state's contention on appeal that Mr. Oliver was frisked "for protective purposes" in preparation for Officer Runyan searching the vehicle. (*See* Appellee's Brief at 40.) And, his body camera footage likewise does not support the state's claim on appeal that Officer Runyan searched Mr. Oliver's person for officer safety. (*See generally* Hearing Ex. 4.) Both his testimony and body camera indicate Officer Runyan frisked Mr. Oliver for drugs.

{¶ 91}   In his report, though, Officer Runyan stated: "In my experience, when illegal drugs are present, there is a high probability that weapons are also present. For this reason,

I secured the driver in handcuffs, and conducted a search of his person for illegal contraband." (Hearing Ex. 3 at ¶ 2.) At the hearing, Officer Runyan testified that he was "looking specifically for marijuana" when he decided to pull Mr. Oliver (and the other passengers) out of the vehicle to search them. (Tr. at 43.) Officer Runyan clarified that he included the "high probability of weapons" language in his report "because I'm putting somebody in handcuffs because I'm *concerned that they might have an illegal drug*, so I'm more justifying the handcuffing of the suspects *as opposed to saying what I'm searching for*." (Emphasis added.) (Tr. at 43. *See also* Tr. at 48-49.)

{¶ 92} Since the state did not argue the search was a lawful *Terry* frisk below, the requisite factual inquiry for proper analysis of that issue was not done by the trial court. The state did not offer the necessary evidence at the hearing—testimony from Officer Runyan that the pat-down search was done for officer safety—that would trigger the need for the trial court to evaluate whether, under the totality of the circumstances, Officer Runyan had an objective, reasonable, and particularized basis to suspect Mr. Oliver was armed and presently dangerous. *See, e.g.*, *State v. Scarberry*, 10th Dist. No. 15AP-775, 2016-Ohio-7065, ¶ 23, citing *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). So, the trial court made no findings on the issue of whether the pat-down search was justified under *Terry* when it ruled on Mr. Oliver's suppression motion.[16]

{¶ 93} The prosecutor instead maintained at the hearing that Officer Runyan searched Mr. Oliver's person because he smelled raw marijuana emanating from the vehicle. Officer Runyan's testimony was consistent with that claim. (Tr. at 62-67.) " 'An officer cannot conduct a protective search as a pretext for a search for contraband, a search for convenience, or as part of his or her normal routine or practice.' " *State v. Morris*, 10th Dist. No. 09AP-751, 2010-Ohio-1383, ¶ 15, quoting *State v. Stamper*, 7th Dist. No. 03-MA-144, 2004-Ohio-5366, ¶ 12. "The sole justification of the search * * * is the protection of the

[16] We note the trial court stated in its decision that "[Officer Runyan] ordered [Mr. Oliver] to exit the vehicle, placed him in handcuffs, and conducted a pat down search for officer safety." (Decision and Entry at 6.) However, the trial court's decision contains no legal discussion or analysis related to that statement. The trial court's decision also is devoid of any evaluation as to whether Officer Runyan reasonably believed Mr. Oliver to be armed and dangerous. Officer Runyan did not testify the search was conducted for officer safety or that he believed Mr. Oliver was armed and presently dangerous. The state did not argue these points in the trial court either. Thus, we find the trial court's statement that the pat-down search was conducted "for officer safety" to be—if not perfunctory dicta—not supported by competent, credible evidence in the record.

police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29.

**{¶ 94}** It would be inappropriate for us to speculate that Officer Runyan frisked Mr. Oliver due to "officer safety concerns" or for "protective purposes"[17] in the absence of any testimony from Officer Runyan explicitly stating this and given the prosecutor's failure to argue this legal justification at any time in the court below. "To address this argument for the first time at this stage of the proceedings would be for this court to act as the trial court rather than as an appellate court." *Atchley*, 2007-Ohio-7009 at ¶ 9. *See also O'Brien v. Ohio State Univ.*, 10th Dist. No. 06AP-946, 2007-Ohio-4833, ¶ 10, citing *Hardy v. Fell*, 8th Dist. No. 88063, 2007-Ohio-1287, ¶ 29 ("This court * * * is not a trial court, and we cannot be the de novo trier of fact."). " 'A party may not * * * present new arguments for the first time on appeal.' " *Heimberger v. Zeal Hotel Group Ltd.*, 10th Dist. No. 15AP-99, 2015-Ohio-3845, ¶ 24, quoting *Clifton Care Ctr. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 12AP-709, 2013-Ohio-2742, ¶ 13.

**{¶ 95}** Further, since Officer Runyan did not even claim he believed Mr. Oliver was armed and presently dangerous prior to the frisk, it would also be inappropriate for us to evaluate whether a belief the officer ***did not testify he had*** was reasonable under the totality of the circumstances. *See, e.g., Ybarra*, 444 U.S. at 93 (finding an absence of reasonable suspicion where "the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous."). *Compare with In re G.H.*, 8th Dist. No. 100274, 2014-Ohio-2269, ¶ 32-33 (when officer testifies that protective pat-down was conducted due to officer safety concerns, court will consider all other facts officer was aware of at the time of the search in evaluating whether officer could reasonably believe suspect was armed and dangerous such that protective search was necessary to ensure officer safety).

---

[17] In its brief, the state proffers that "[a]fter deciding to search the vehicle, Officer Runyan reasonably determined a pat-down of [Mr. Oliver] was necessary for protective purposes." (Appellee's Brief at 40.) That assertion, however, is not supported by any citation to the record. Officer Runyan did not testify that he detained and frisked Mr. Oliver because he was planning to search the vehicle. (*Compare with* Tr. at 17, 42-43.) Nor does Officer Runyan's written report or his body worn camera footage clearly show he detained and frisked Mr. Oliver in preparation for searching the vehicle. (*See* Hearing Ex. 3 at ¶ 2; Hearing Ex. 4.)

**{¶ 96}** Therefore, for these reasons, we find the state waived the issue for purposes of appeal. *See, e.g.*, *Atchley*, 2007-Ohio-7009 at ¶ 8-9 (finding that defendant's failure to adequately raise the basis of his challenge to a warrantless search constitutes a waiver of that issue on appeal); *Wintermeyer*, 2019-Ohio-5156 at ¶ 25 (holding that "when the state does not assert in the trial court that a defendant lacks Fourth Amendment standing to challenge a contested search or seizure, the state may not assert that argument in its own appeal from a judgment granting a motion to suppress.").

### 3. The state did not argue inevitable discovery below, thus waiving this issue for purposes of appeal

**{¶ 97}** The state also argues that even if the search did not satisfy the standard articulated in *Terry*, the inevitable discovery rule supports the evidence's admissibility.

**{¶ 98}** Mr. Oliver clearly challenged the warrantless search of his person in the trial court, but the state did not argue inevitable discovery below. As a result, the trial court did not make findings on that issue. As a result, we find the state waived the issue for purposes of appeal. *See, e.g.*, *Atchley* at ¶ 8-9; *Wintermeyer* at ¶ 25.

### 4. The good faith exception to the exclusionary rule does not apply

**{¶ 99}** Based on the foregoing, we find the state failed to establish the warrantless search of Mr. Oliver's person was constitutionally reasonable. Therefore, we must determine whether the evidence obtained during the unconstitutional search should have been suppressed.

**{¶ 100}** "The exclusionary rule bars the use of evidence secured by an unconstitutional search and seizure." *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶ 34, citing *State v. Johnson*, 141 Ohio St.3d 136, 2014-Ohio-5021, ¶ 40, citing *Weeks v. United States*, 232 U.S. 383, 394 (1914) (announcing the exclusionary rule), and *Mapp v. Ohio*, 367 U.S. 643, 655, (1961) (extending the exclusionary rule to the states).

**{¶ 101}** The exclusionary rule is applied to evidence found as a result of an unconstitutional search or seizure when its application will result in appreciable deterrence of Fourth Amendment violations. *See, e.g.*, *Leak* at ¶ 34; *State v. Schubert*, ____Ohio St.3d ____, 2022-Ohio-4604, ¶ 8. Under this doctrine, despite the unlawful seizure of evidence, when "an officer acts with an objectively reasonable, good-faith belief that his or her conduct is lawful, the deterrence rationale for the exclusionary rule loses force," and thus

does not support the exclusion of the unlawfully seized evidence. *Banks-Harvey*, 2018-Ohio-201 at ¶ 33. *See also Leak* at ¶ 35, citing *Johnson* at ¶ 50.

{¶ 102} The good-faith exception may apply when an officer conducts an unlawful search or seizure laboring under a mistake of law. *See, e.g.*, *State v. Stadelmann*, 1st Dist. No. C-130138, 2013-Ohio-5035, ¶ 10 (holding that because the officer had a good faith belief that the defendant's turn violated the relevant traffic law, the court properly denied his motion to suppress despite the officer's mistake of law); S*tate v. Gunzenhauser*, 5th Dist. No. 09-CA-21, 2010-Ohio-761, ¶ 16 ("Under limited circumstances, courts have held that the exclusionary rule may be avoided with respect to evidence obtained in a stop based on conduct that a police officer reasonably, but mistakenly, believes is a violation of the law."); *Heien v. North Carolina*, 574 U.S. 54, 67-68 (2014) (denial of defendant's motion to suppress was proper because officer's mistaken belief that the law required two operating headlights, instead of one, was objectively reasonable based on the circumstances).

{¶ 103} However, the good-faith exception is limited. " 'Because courts must be cautious in overlooking a police officer's mistakes of law, the mistake must be objectively reasonable.' " *State v. Reedy*, 5th Dist. No. 12-CA-1, 2012-Ohio-4899, ¶ 18, quoting *Gunzenhauser* at ¶ 16. *See also Heien* at 61, quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

{¶ 104} Officer Runyan testified he believed he could search Mr. Oliver's person for drugs based solely on the fact that he smelled what he believed to be the odor of raw marijuana coming from a vehicle with four other occupants. (*See* Tr. at 43-45, 52-53.) Setting aside recent legislative actions legalizing cannabis in limited situations, Ohio law has **never** permitted a warrantless search of a person under the circumstances presented in this case: the odor of raw marijuana emanating from a vehicle occupied by five people, without any evidence connecting the particular person searched to the source of that odor. We thus find Officer Runyan's belief that he was authorized to search Mr. Oliver's person merely because he detected the odor of raw marijuana coming from a car with four other occupants was not sufficiently reasonable to trigger the protection of the good-faith exception.

{¶ 105} As a result, the evidence obtained from the warrantless pat-down search should have been suppressed. *See Xenia*, 37 Ohio St.3d at 219; *Wong Sun*, 371 U.S. at 487-

88. Accordingly, we find the trial court erred by overruling Mr. Oliver's suppression motion and failing to suppress evidence obtained through the pat-down search of his person, as well as any evidence and statements gathered subsequent to the search as derivative "fruits" thereof.

{¶ 106} Based on the foregoing, we find the state did not satisfy its burden in the trial court of establishing that one of the well-defined exceptions to the Fourth Amendment's warrant requirement applied to the warrantless search of Mr. Oliver's person in this case. *See Banks-Harvey*, 2018-Ohio-201 at ¶ 39, citing *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978). As a result, the warrantless search of his person was unreasonable and, thus, violated the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution. *See id.* Because the firearm was a fruit of that unconstitutional search, it should have been suppressed by the trial court. The trial court erred in failing to do so. We therefore sustain Mr. Oliver's sole assignment of error.

## III. CONCLUSION

{¶ 107} Having sustained Mr. Oliver's sole assignment of error, we reverse the Franklin County Court of Common Pleas judgment denying Mr. Oliver's suppression motion, vacate Mr. Oliver's felony convictions and sentence—which were based solely on the evidence found on his person during the unconstitutional search—and remand this case to the trial court for proceedings consistent with this decision.

*Judgment reversed;*
*convictions and sentence vacated;*
*cause remanded.*

LUPER SCHUSTER and MENTEL, JJ., concur.